In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-18-00482-CV**
_____

**IN THE INTEREST OF T.R.S.**

**On Appeal from the 253rd District Court**
**Liberty County, Texas**
**Trial Cause No. CV1712251**

**MEMORANDUM OPINION**

In this parental-rights termination case, Father[1] seeks to overturn the final judgment terminating his parental rights to his daughter based on his claim that the evidence does not support the trial court's finding that terminating his relationship with his daughter is in her best interest.[2] For the reasons explained below, we

---

[1] To protect T.R.S.'s identity, we use a pseudonym for her name, her father's name, and the name of her foster mother. *See* Tex. R. App. P. 9.8(a), (b).

[2] *See* Tex. Fam. Code Ann. § 161.001(b)(2) (West Supp. 2018).

1

conclude that legally and factually sufficient evidence is in the record to support the trial court's best-interest finding.

Background

The record shows the Department of Family and Protective Services sued Father in July 2017 seeking to terminate his parental rights to Tricia based on reports alleging that Father "ha[d] been addicted to drugs for years," had been seen under the influence of drugs while around Tricia, and that Tricia's home was infested with lice and mold. The Department also alleged that Father had not allowed the Department's caseworker to have access to Tricia's home or to interview her.

The Department tried the case in a bench proceeding in December 2018. The trial lasted two days. Tricia was six years old when the trial occurred. On the first day of the trial, the Department called the Department's caseworker, Tricia's foster mother, and the individual the trial court appointed to serve as Tricia's court-appointed special advocate (CASA). That same day, the court and the attorneys representing the parties interviewed Tricia in the court's chambers. Father also testified on the first day of the trial. On the second day of the trial, Father called a woman, "Mary."[3] Mary testified that she knew Father when he was younger and that she and Father had reconnected just months before the trial.

---

[3] A pseudonym.

2

Generally, the testimony in the trial shows that before the Department sued, Father had worked as a tattoo artist for over two decades. He was still working in that occupation at the time of the trial. The evidence revealed that Father and Tricia both love each other, and Father stated a desire to raise her. During the testimony, Father claimed that doctors had diagnosed Tricia with autism before he and Tricia moved to Texas. Father also testified that every time he sees Tricia, she asks him "when she's going to get out of" the home where she now lives.

For the most part, the trial focused on Father's drug use. Father testified that he is not addicted to any drugs, admitted he used a prescription stimulant in the past, and stated he was not currently taking the stimulant but agreed that he still needs it. Father explained that before he and Tricia moved to Texas, he smoked marijuana. He denied using methamphetamines since leaving college "a long time ago." During the trial, Father agreed the drug testing he completed showed he had used marijuana and amphetamines, but he claimed the tests do not show that he was using meth.[4] Still, Father testified that the lab that did his tests should have categorized the results assigned to his tests as false positives and not classified them as positive results.

---

[4] The only evidence admitted in the trial about Father's drug testing came from witnesses who testified about the results. Neither the Department, nor Father, ever asked the trial court to admit any of the records that contained the results of Father's drug tests.

According to Father, his tests results were positive because he had taken a medication to prevent heartburn. Father claimed that any drug tests he missed resulted from missing the telephone calls informing him of the dates the lab scheduled the tests.

Father addressed questions about his work, job opportunities, the support he provided to Tricia, and where he lived after the Department removed Tricia from his care. Father explained that he lived with his mother for a while, but she kicked him out, which left him no place to live. Father stated that he currently lives with the owner and owner's family of the tattoo shop where he works. He explained that he often stays in the shop all night depending on his schedule. While Father denied his current roommate has a criminal history or history with the Department, he stated that he never asked his roommate to speak with the Department's investigator because he never intended to have Tricia live where he currently resides.

Father addressed his future plans for Tricia when he testified. According to Father, he has a better job opportunity to work and earn more as the manager of a tattoo parlor in Florida. Father explained that if the court allowed him to maintain his possessory rights, he would stay in Texas but that his ultimate goal is to move to Florida and manage a tattoo parlor there. Father agreed that if the court placed Tricia with Mary, he could not help support Tricia because he has "no support here." Father

4

reiterated: "My plan was not to be here, my plan was to be in Florida and I had it all set up." Father's testimony allowed the trial court to conclude he has provided little support to Tricia. He has supplied her with some things when she asks, like clothes and toys.

The testimony of the Department's caseworker shows that Father violated the Department's service plan and failed to complete several substance abuse programs. The caseworker stated that Tricia came into the Department's care in July 2017, after the Department received a report that Father was seen under the influence of drugs while Tricia was present. According to the caseworker, Father took drug tests in July 2017 and July 2018. The caseworker stated the tests were positive for methamphetamine. The caseworker explained that while handling the case, she learned that another child protective agency in another state had investigated Father based on his reported use of drugs. The caseworker testified that after the Department sued, Father missed over twenty of the tests he was supposed to take to determine whether he was taking drugs. According to the caseworker, Father told her he missed the tests because he did not want "to do drug tests for [the Department] anymore." She also stated she believes Father still uses illegal drugs.

The testimony in the trial addressed Father's employment and living arrangements. The caseworker testified that Father told the Department that he

5

worked at a tattoo parlor, but he had no paperwork to document what he made there. During the trial, the caseworker expressed her concerns about Father's living arrangements. She stated that if the trial court required the Department to return Tricia to Father, "[she] wouldn't know where [Tricia] would be living." The caseworker acknowledged that Father never missed any visits with Tricia while Tricia was in the Department's care. The caseworker stated that she thought Father's parental rights should be terminated due to his failure to complete a drug rehabilitation program required by his family service plan. She also explained that, in her opinion, Father knowingly placed or allowed Tricia to remain in conditions or surroundings that endangered Tricia's physical or emotional well-being. According to the caseworker, Tricia's best interest would be served by terminating Father's rights because he could not provide Tricia a safe and stable home.

Tricia's CASA testified that currently, Tricia is living in a home where she is happy, playful, and active in Girl Scouts. She explained that Tricia has excellent grades in school. According to the CASA, Tricia expressed a desire to be with Father and to remain in the school where she has many friends. The CASA stated that Tricia recently said "she has wished to move to Florida and go to Disney World and go to the beach like her dad promised her." The CASA agreed that since the Department

removed Tricia, Father had seen Tricia regularly, Tricia desired to see him, and he had given Tricia toys and clothes.

That said, the CASA expressed concern about whether Father had the skills needed to care for Tricia. According to the CASA, Father tested positive on the drug tests that he took in the summer of 2018. She stated that Father's current roommate refused to cooperate with the Department's efforts to check his background to allow the Department to evaluate whether "it would be possible for reunification there." The CASA explained she had not been able to determine whether Father's current living arrangement offers Tricia a stable and drug-free environment. The CASA stated she understood that Tricia's foster mother wants to adopt Tricia, and that the foster mother is agreeable to allowing Tricia to communicate with her Father. According to the CASA, it would not be in Tricia's best interest for the court to place Tricia in Mary's home. Finally, the CASA testified that, in her opinion, it was in Tricia's best interest for her Father's rights to be terminated.

Tricia's foster mother, "Terry," testified in the trial about Tricia's current placement. According to Terry, Tricia has lived with her for almost sixteen months. Terry stated that Tricia calls her mom, and she described Tricia as a normal six-year-old child. Terry explained that she wants to adopt Tricia, that Tricia does well in school, that Tricia likes to model, and that Tricia attends church and goes to movies.

According to Terry, Father has her phone number, but he has not contacted her often asking to speak to Tricia even on holidays or on Tricia's birthday. Terry explained that Tricia attends play therapy sessions one day a week. Terry acknowledged that if she adopted Tricia, the law would not require her to allow Father to contact Tricia. Even so, Terry testified that she believes Father and Tricia should have an ongoing relationship with each other. Terry explained she would leave that option open if Father would agree to contact Tricia consistently and agree to have his visits supervised by the Department.

The trial court interviewed Tricia in chambers during the trial.[5] In the interview, Tricia stated she wanted to continue to live in her current placement if Father could not live with her. She explained that she wants to continue to have a relationship with her father, that she is happy in her current placement, and that she would like to stay in school where she has "lots of friends." Yet Tricia stated that, if given a choice, she would like to accompany her Father and move to Florida.

During her testimony, Mary offered to serve as Tricia's foster mother so Father could maintain possessory rights to Tricia. Mary explained that based on Father's proposed plan, the court could avoid terminating Father's rights and

---

[5] *See id.* § 153.009(b), (e) (West 2014).

8

preserve his right to one day have his rights restored as Tricia's managing conservator.[6]

In final argument, the Department acknowledged that Tricia desires to live with Father. It argued, however, that living with Father is not in Tricia's best interest because he uses illegal drugs and failed to complete a drug rehabilitation program. The Department also argued Father violated his family service plan and had not shown the ability to provide Tricia with a safe place to live. The attorney ad litem who the trial court appointed to represent Tricia in the case argued that denying the Department's request to terminate Father's rights while allowing Father to continue to work on his parenting skills is the plan she thought would best serve Tricia's interests. Father's attorney argued that Father is in transition, has no resources to care for Tricia, no plans to provide Tricia significant support required to live in Texas, and no plan to house Tricia since Texas is not the state he was planning to make his permanent home. Father's attorney also argued the evidence showed that Father loved Tricia, that Father was willing to care for her based on his decision to remain in Texas, and that Father was exercising his rights to see her.

---

[6] Father testified that placing Tricia with Mary was "never my plan[,]" but that Mary's home was nice and would be a safe place for Tricia to live. He asked the trial court to consider placing Tricia in Mary's home.

When the trial ended, the trial court announced its decision to find by clear and convincing evidence that the Department established Father's rights should be terminated under subsections D, E, and O.[7] The trial court then advised the parties that the court was also ruling that terminating Father's parental rights would be in Tricia's best interest.[8] The day the trial court announced its ruling, it signed a judgment terminating Father's rights.[9] The judgment is consistent with the findings the trial court announced at the conclusion of the trial.

## Standard of Review

The standards that apply to the arguments Father raises in his brief require this Court to review the trial court's findings "'in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'"[10] To uphold a verdict terminating a father's right to parent a child, the record must establish, by clear and convincing evidence,

---

[7] *See id.* § 161.001(b)(1)(D), (E), (O) (West Supp. 2018).

[8] *Id.* § 161.001(b)(2).

[9] The trial court's judgment terminating Father's parental rights appoints the Department as Tricia's permanent managing conservator. It ordered no changes over Tricia's current placement.

[10] *See In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

(1) the parent committed one or more of the prohibited acts or omissions listed in section 161.001(b)(1) of the Texas Family Code, and (2) that terminating the parent's rights is in the child's best interest.[11] Currently, the statute authorizing a parent-child relationship to be terminated includes twenty-one grounds for termination, any of which can authorize a factfinder to terminate a parent's relationship with the child.[12]

Here, the trial court's findings are based, in part, on three subsections of the Family Code: subsection D, based on the trial court's finding that Father knowingly allowed Tricia to remain in conditions or surroundings that endangered her physical or emotional well-being; subsection E, based on the trial court's finding that Father engaged in conduct or placed Tricia with persons who engaged in conduct that endangered her physical or emotion well-being; and subsection O, based on the trial court's finding that Father violated the provisions of his court-ordered, family service plan.[13] A positive finding relying on any one of these grounds, when coupled with a second and required finding that terminating the relationship is in the child's

---

[11] *See* Tex. Fam. Code Ann. § 161.001(b)(1), (b)(2) (West Supp. 2018).

[12] *See id.* § 161.001(b)(1).

[13] *Id.* § 161.001(b)(1)(D), (E), (O).

best interest, allows a trial court to render a judgment terminating the parent's relationship with his or her child.[14]

When reviewing a trial court's findings, we must assume the trial court resolved all facts in a way that favors the finding the appellant has challenged if the evidence allowed the court to reasonably make the finding that is being challenged.[15] When reviewing the evidence, we disregard all evidence that the trial court could have disbelieved or found incredible.[16] We must overrule a legal sufficiency challenge if the evidence in the record allowed the trial court to form a firm belief or conviction that the matter the Department had to prove was true.[17]

In a factual sufficiency review, we consider and weigh all the evidence in the record after giving deference to the trial court's findings to avoid supplanting the trial court's verdict with our own.[18] If, given the entire record, the disputed evidence the trial court could not have credited in favor of its finding is so significant that the

---

[14] *See id.* § 161.001(b)(2); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014).

[15] *In re J.F.C.*, 96 S.W.3d at 266.

[16] *Id.*

[17] *In re J.L.*, 163 S.W.3d at 85.

[18] *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

trial court could not have reasonably formed a firm belief or conviction that the finding that has been challenged could have been found to be true, the appellate court will find the evidence is factually insufficient to support the challenged finding.[19] Stated another way, we give the trial court's findings due deference to avoid substituting our judgment for the one the trial court made based on the evidence admitted in the trial.[20]

## Best Interest of the Child

On appeal, Father does not argue there was not enough evidence before the trial court to support the trial court's findings that Father violated subsections D, E, and O of the Family Code.[21] Instead, Father challenges the legal and factual sufficiency of the trial court's best-interest finding.

"In determining whether the evidence is legally sufficient to support a best-interest finding, we 'consider the evidence that supports a deemed finding regarding best interest and the undisputed evidence,' and ignore evidence a fact-finder could reasonably disbelieve."[22] Under the Family Code, a "rebuttable presumption [exists]

---

[19] *In re J.O.A.*, 283 S.W.3d at 345 (citing *In re J.F.C.*, 96 S.W.3d at 267).

[20] *See In re H.R.M.*, 209 S.W.3d at 108.

[21] Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O).

that the appointment of the parents of a child as joint managing conservators" will serve the child's best interest.[23] Yet, this is a rebuttable presumption, and courts must also presume that a prompt and permanent placement of the child in a safe environment is in the child's best interest.[24]

When reviewing a best-interest finding, we consider the nine factors identified by the Texas Supreme Court in *Holly v. Adams*.[25] These nine factors are not

---

[22] *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (quoting *In re J.F.C.*, 96 S.W.3d at 268).

[23] Tex. Fam. Code Ann. § 153.131(b) (West 2014); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with its parents).

[24] Tex. Fam. Code Ann. § 263.307(a) (West Supp. 2018).

[25] In *Holley*, the Texas Supreme Court applied these factors when reviewing a best-interest finding:
- the child's desires;
- the child's emotional and physical needs, now and in the future;
- the emotional and physical danger to the child, now and in the future;
- the parenting abilities of the parties seeking custody;
- the programs available to assist the parties seeking custody;
- the plans for the child by the parties seeking custody;
- the stability of the home or the proposed placement;
- the parent's acts or omissions that reveal the existing parent-child relationship is improper; and
- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

14

exclusive, as courts may consider other factors when weighing whether terminating a parent's relationship with a child would be in the child's best interest.[26] The record also need not contain evidence addressing each of the *Holley* factors "particularly if the evidence [is] undisputed that the parental relationship endangered the safety of the child."[27] And no one *Holley* factor is controlling.[28] Additionally, evidence of one factor may be enough to support a finding that terminating the relationship is in the child's best interest.[29] The same evidence that supports a trial court's findings under subsections D, E, and O may also be relevant to the trial court's best-interest finding.[30] Best-interest findings may be based on either direct, or circumstantial evidence, or on subjective factors the trial court may have observed in the trial.[31] When evaluating what is best for a child's future, trial courts are allowed to consider

---

[26] *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

[27] *Id.* at 27.

[28] *See In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

[29] *Id.*

[30] *See In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

[31] *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

15

a parent's past conduct when that conduct is relevant to the child's best interest.[32] In our review, we evaluate whether the evidence supports the best-interest finding from the standpoint of the child, not the child's parent.[33]

## Analysis—Best-Interest Finding

Father argues there was not enough evidence to support the trial court's conclusion that terminating his rights served Tricia's best interest. In his brief, Father focuses on three aspects of the evidence to support his arguments: (1) the statements Tricia made in chambers about wanting to maintain her relationship with her father; (2) the evidence that he and Tricia are bonded; and (3) the evidence about his plans for Tricia, which contemplated placing Tricia in Mary's home while allowing Father to preserve his possessory rights.

We look to all the evidence the trial court could have reasonably considered relevant to its best-interest finding to evaluate whether the evidence supports the finding.[34] In contrast, Father focuses his arguments on the evidence that is contrary

---

[32] *Id.*

[33] *See In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.) (citing *In re S.A.P.*, 169 S.W.3d 685, 707 (Tex. App.—Waco 2005, no pet.)).

[34] *In re J.F.C.*, 96 S.W.3d at 266 (explaining that appellate courts should look at *all* the evidence in the light most favorable to the finding and credit evidence the factfinder could have reasonably found to be clear and convincing).

16

to the trial court's finding without discussing why other evidence in the record does not provide sufficient support for the finding. For example, while there is substantial evidence in the record to show that Tricia and Father love each other and have bonded, the trial court did not have to weigh that evidence more heavily than the evidence that addressed Tricia's need for a safe and stable home.[35] Stated another way, Tricia's desire to be with her father did not require the trial court to agree with Father's argument that terminating his rights was contrary to Tricia's best interests.[36]

Under the Family Code, endangering a child means "to expose to loss or injury [or] to jeopardize" a child's emotional or physical health.[37] "Conduct" includes both a parent's acts and their failures to act.[38] Here, the evidence shows that Father had a history of taking illegal substances, including methamphetamine. The evidence shows Father was fully aware of the fact he needed to complete a drug treatment program so that he could create a safe and stable home for his child. But the evidence is undisputed that Father never completed a drug treatment program, so the trial court

---

[35] *In re M.Y.G.*, 423 S.W.3d 504, 514 (Tex. App.—Amarillo 2014, no pet.); *see also In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.).

[36] *B.B. v. Tex. Dep't of Family & Protective Servs.*, 445 S.W.3d 832, 838 (Tex. App.—El Paso 2014, no pet.).

[37] *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

[38] *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

could infer that he never gained the tools he needed to quit using drugs. The record also allowed the trial court to infer that Father still uses illegal drugs.

Given the evidence in the record about Father's drug abuse, the trial court could reasonably infer that Father's use of illegal drugs exposed Tricia to the possibility that he could not adequately care for her or end up in jail.[39] In his brief, Father fails to address much of the evidence that is relevant to the trial court's best-interest finding. For example, Father never explains why the trial court could not view his violations of the family service plan as relevant to its best-interest finding. Father also does not argue he was unaware of the requirement that he complete a drug treatment program to be considered a parent with the skills he needed to capably raise a child.

---

[39] *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617-18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (noting evidence of drug use to explain that the parent engaged in an endangering course of conduct); *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (explaining that parent's history of drug use is relevant to reviewing a challenge to a best-interest finding); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86-87 (Tex. App.—Dallas 1995, no writ) (allowing factfinder to weigh a parent's drug-related conduct in deciding what would be in the child's best interest); *see also* Tex. Fam. Code Ann. § 263.307(b)(8) (West Supp. 2018) (providing that courts may consider the parent's history of substance abuse by the parent or others having access to the child when considering whether the child's parent is willing and able to provide the child with a safe environment).

The evidence showing Father had historically used illegal drugs and continues to use them supports the trial court's best-interest finding.[40] The evidence that Father refused to cooperate with a regular drug test program offers additional support for the trial court's inference that Father continues to use illegal drugs.[41] We conclude the record contains clear and convincing evidence sufficient to allow the trial court to decide that Father voluntarily, deliberately, and consciously engaged in a course of conduct that endangered Tricia's well-being.[42]

The evidence relevant to the conditions in which Father was housing Tricia before the Department removed her from Father's care proves additional support for the trial court's best-interest finding. The evidence allowed the trial court to infer that Father did not have the parenting skills or the resources that are needed to raise a child.[43] Father provided little financial support to assist the Department with the

---

[40] *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (explaining that many findings relevant to a trial court's conclusion about a parent's violations of court-ordered, family service plans can support a trial court's best-interest finding).

[41] *See In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied); *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.).

[42] *Id.*

[43] *In re R.W.*, 129 S.W.3d 732, 738-39 (Tex. App.—Fort Worth 2004, pet. denied); *see also Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

expenses of Tricia's care. Father also testified that he lacks any prospects of getting a better job in Texas. This testimony, when considered against a backdrop that Father was using and continued to use meth, together with evidence about his lack of income or prospects for a job that paid more allowed the trial court to infer that he probably would never be able to provide Tricia with a safe or a stable home. While Father offered an alternative plan allowing Mary to raise Tricia in her home, the trial court may have inferred that plan did not serve Tricia's best interest given that Tricia and Mary are unrelated to one another and that Tricia and Mary first met on the first day of the trial.[44]

Father argues that his plan for Tricia was better than the plan offered by the Department. We review a trial court's best-interest finding, however, in the light that most favors the trial court's finding.[45] The trial court rejected Father's plan, and its decision was not unreasonable on the record that is before us here. The trial court was entitled to consider the Department's plan to be superior and in Tricia's best interest since it allowed Tricia to remain in a school where she has friends and gave Tricia the prospect of being adopted and raised by an adult in a safe and stable home.

---

[44] *See In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

[45] *In re J.L.*, 163 S.W.3d at 85.

We conclude the record contains legally and factually sufficient evidence supporting the trial court's best-interest finding. Therefore, we overrule Father's sole issue.

## Conclusion

For the reasons we explained above, we affirm the trial court's judgment.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on May 6, 2019
Opinion Delivered June 13, 2019

Before McKeithen, C.J., Horton and Johnson, JJ.